IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

**JIMMY CLEMMONS,**

    Plaintiff,

v.                                                                    CV 09-J-1500-IPJ

**JIM BISHOP CHEVROLET BUICK
PONTIAC GMC, INC.,**

    Defendant.

## MEMORANDUM OPINION

Plaintiff Jimmy Clemmons has filed suit against defendant Jim Bishop Chevrolet Buick Pontiac GMC, Inc. ("Jim Bishop Chevrolet" or "dealership") for alleged violations of the Age Discrimination in Employment Act ("ADEA") 29 U.S.C. § 621 *et seq.* and the Alabama Age Discrimination in Employment Act ("AADEA") Ala. Code § 25-1-20, *et seq.* Defendant Jim Bishop Chevrolet filed a motion for summary judgment (doc. 21), and a brief and evidentiary materials in support (docs. 22-23). Plaintiff has submitted a brief in opposition to summary judgment (doc. 33), evidentiary materials (doc. 34), and a "Response to Defendant's Statement of Facts" (doc. 35).

### Factual Background

Jim Bishop ("Bishop"), the chief executive officer of Jim Bishop Chevrolet, hired Jimmy Clemmons as a sales manager at the dealership in 1991.  Jimmy Clemmons Dep., at 6-8 (doc. 23-1); Jim Bishop Dep., at 12 (doc. 23-2).  Bishop was the majority owner of the dealership until April of 2008 when Brad Bishop, Jim Bishop's son and until that point a minority shareholder, purchased the dealership.  Bishop Dep. at 9, 27-28.

In December of 2007 Jim Bishop Chevrolet employed four sales managers: David Hallmark, Johnny Wright, Donnie Roden, and Jimmy Clemmons.[1]  Clemmons Dep. at 16-18.  All of the sales managers "closed deals," worked with salespeople, and were responsible for sales, Bishop Dep. at 14 (doc. 23-2), but each also had specific duties at the dealership.  Bishop Dep. at 28.  Johnny Wright, who had the longest tenure at the dealership, was Bishop's "right arm" for 25 years.  Clemmons Dep. at 29, 128; Bishop Dep. at 12.  Wright could sign checks and mainly focused on appraising and purchasing used cars, but if Bishop was not present at the dealership, Wright was the final decision-maker.  Bishop Dep. at 14-15.  Hallmark was trained in customer retention management ("CRM");

---

[1] Roden's date of birth is September 8, 1961; Wright's date of birth is April 10, 1954; and Clemmons' date of birth is September 9, 1942.  Hallmark is over the age of forty. Ex. G to Plaintiff's Evidentiary Submission (doc. 34-7); Ex.H to Plaintiff's Evidentiary Submission (doc. 34-7).

Roden "ran the Buick-GMC-Pontiac operation" and had responsibilities related to finance and insurance for the dealership; and Clemmons dealt with customer satisfaction.  Bishop Dep., at 32-33.

Beginning in 2005 and continuing at least until 2008, Jim Bishop Chevrolet was operating at a loss, making no net profit.[2]  James Brad Bishop Aff. at 1 (doc. 23-4).  For the dealership, personnel was the biggest expense, followed by floor plan and then advertising.  Bishop Dep., at 43.  The floor plan was cut by lowering inventory, and Bishop also cut advertising and other expenses.  Bishop Dep., at 40, 43, 98.  Bishop "tried to eliminate any excess expense that we had before we got into personnel," Bishop Dep., at 98, and "tried to maintain a good course of frugalness and [keep] things down to a bare minimum."  Bishop Dep., at 153-154.  Bishop was also able to control costs by moving Ronnie Garner from general manager to sales and Wright to used car manager in 2005.  Johnny Wright Dep., at 18-19 (doc. 23-3).

Bishop waited until December of 2007 to further restructure his

---

[2]The dealership's taxable income in 2005 was -$481,859.00; in 2006 was -$841,777.00; in 2007 was -$622,729.00; in 2008 was -$1,516,169.00.  James Brad Bishop Aff. at 1.  During his deposition, the plaintiff noted that there was "less traffic" in the dealership during 2007 and admitted that his diminished earnings in 2007 indicate that the dealership did not close as many deals.  Clemmons Dep., at 27-28.

management team because the managers had "been with [him] a long time, and [he was] just trying to hang on as long as [he] could."  Bishop Dep., at 153.  On December 7, 2007, a Friday, Wright told Clemmons that Bishop wanted to see him in Bishop's office.  The parties agree that Bishop began the meeting by stating, "I don't have to do this very often, but I'm losing my ass."  Bishop Dep., at 87-88; Clemmons Dep., at 31-32.  Bishop then explained that he had to remove Clemmons from his position as a sales manager and offered him a position as a salaried salesperson.  If Clemmons were to accept the position, he would have been paid his then-salary of $1,700.00 per month plus thirty percent commission on any cars he personally sold.[3]  Clemmons Dep., at 31-32.  In addition, the plaintiff would be given bonuses and commission as though he had retained his position as sales manager through December of 2007.  Clemmons Dep., at 40.  Clemmons stated that he wanted to have the weekend to make a decision, and on Monday, he informed Wright that he did not want the position.[4]  Clemmons Dep.,

---

[3]Bishop explained that he knew Clemmons could make a "substantial living" because he had a "good following" of customers.  Bishop Dep., at 39.

[4]Plaintiff did not return to work after December 7, 2007, but he was paid his full salary and commission as though he worked for the entire month of December.  Clemmons Dep., at 40.  In January of 2008 Clemmons retained employment as a sales manager with a dealership, "Lyons," in Lewisburg, Tennessee for about two weeks.  He was then unemployed for several weeks before taking a job as a salesperson at Bentley Chevrolet, his current place of employment.  Clemmons

at 40.

The parties dispute[5] whether Bishop terminated Clemmons and then made a new offer of employment. The plaintiff contends that Bishop stated, "'I'm going to have to let you go,'" and after a five minute pause of "dead silence," Bishop offered to rehire Clemmons as a salesperson. Clemmons Dep., at 31-32. Bishop and Wright testified that there was no discussion whatsoever of laying off Clemmons, Wright Dep., at 24; Bishop Dep., at 87-88, and the silence after Bishop offered Clemmons the salesperson job lasted only a few seconds. Bishop Dep., at 137. Age was not mentioned whatsoever during the meeting.

Plaintiff claims that his removal from his position as a sales manager was due to age-based discrimination and bases this claim on a conversation that occurred two weeks before December 7, 2007. The plaintiff testified:

> I don't remember the conversation, but, I mean, Johnny and Mr. Bishop asked me how old I was, and, of course, I never do talk about age. You know when you get up past 40, you quit talking about age. But I didn't tell them at first and then Johnny asked me two or three times, and, I mean, I finally told them. Of course, they had personnel

---

Dep., at 5-6, 36-37.

[5]At the summary judgment stage, the court is required to consider the evidence in the light most favorable to the plaintiff and may not make credibility determinations nor weigh the parties' evidence. *Frederick v. Spring/United Management Co.* 246 F.3d 1305, 1311 (11th Cir. 2001); *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000).

>   records there. They could have looked it up. . . . I don't recall what we were talking about at the time.
>   A: But y'all weren't just talking about age. You were talking about getting older, weren't you?
>   Q: I don't think that was the conversation, but, you know, like I told you, I don't recall what the conversation was.

Clemmons Dep., at 62-63.[6]  Plaintiff also testified that neither Wright nor Bishop asked each other their ages, nor did either one offer their age. Clemmons Dep., at 63-64.

Both Wright and Bishop claim the conversation took place months before the meeting on December 7, 2007, and describe it as a "break in business BS session." Bishop Dep., at 83; Wright Dep., at 83-84. Bishop explains that he walked into Clemmons' office in the middle of a conversation about how difficult it is to get out of bed as one ages and how one's anatomy begins to change. Bishop testified that Clemmons asked him how old he was, and Bishop "returned the favor." Bishop was surprised when Clemmons said he was sixty-five, and asked, "You're 65?" because Clemmons looks and moves as though he is younger. Bishop Dep., at 82-83.

Wright added that they were talking about some of the employees getting Bishop a birthday cake at the time. Wright Dep., at 66. Wright testified,

---

[6]The plaintiff stated six times during his deposition that he did not remember the context of the conversation. Clemmons Dep., at 62-63, 67-68.

> And I asked – I said – I said, "Jim, how old are you?" And he looked at me and said, "I'll be 58." And then he said, "How old are you?" And I said, "I'm about 53" or something like that, and he said, "Jimmy?" And I know Jimmy said, "Well, boss, I'm turning 65, or 65." And he said, "Dang I tell you what, these birthdays come up on us quick, don't they," or something like that. It was just a casual conversation.

Wright Dep., at 66.

The only evidence Clemmons presents to show the December 7th employment actions were motivated by discriminatory animus is this conversation. Clemmons Dep., at 70, 76, 80. Clemmons testified, "Well, in my mind, I think that's the only reason because Mr. Bishop told me [the night I was fired] . . . it was not because of anything that I had done wrong or anything I'd done right. He said it was just economics." Clemmons Dep., at 70. Clemmons continued, stating that the only information he had "is what Mr. Bishop told me," and he acknowledged that Bishop told him that Bishop "was losing his ass, business was bad, and da, da, da, and all that." Clemmons Dep., at 71. Clemmons did not mention age during the December 7, 2007, meeting nor did he bring it up on the following Monday when he resigned. Wright Dep., at 85.

Bishop testified that his decision to move Clemmons to a salesperson position was based purely on the harsh financial situation facing his dealership. Clemmons had been a good employee, but by removing a manager, the dealership

7

could avoid paying the manager's commission,[7] an expense of 1.75 percent of gross profit. Bishop Dep., at 45, 78. Further, Clemmons was the only sales manager whose duties could be taken over by the remaining sales managers without training them. Bishop Dep., at 76-77.

> Mr. Clemmons, I would have had to have trained him. If Mr. Hallmark left, I'd had [sic] to train him on [customer retention management]. If Mr. Roden would have left, I would have had to get him in [finance and insurance] school so he can do F&I, and Mr Wright is the - - was the general and in charge of operations when I wasn't there.

Bishop Dep., at 51.[8] However, Roden was able to absorb Clemmons' sales

---

[7] Clemmons was paid a salary of $1,700 each month plus a commission of 1.75 percent of gross profit. Clemmons Dep., at 23, 32; Bishop Dep., at 47. In 2006, Clemmons made $100,475.38, and in 2007, he made $93,702.65. Exs. 1-2 to Clemmons Dep.

[8] Donnie Roden's duties included handling finance and insurance. Clemmons Dep., at 25-26; Bishop Dep., at 54. To handle finance and insurance, Wright testified that one must be licensed to sell insurance in the state of Alabama and be computer-oriented. Wright Dep., at 73. Further, Bishop testified that because of new regulations, Clemmons would have needed extensive training to be able to perform finance and insurance duties. Bishop Dep., at 54.
David Hallmark was trained in customer retention management ("CRM"). Bishop Dep., at 32-33. Hallmark dealt with the CRM computer program more than any other manager, and was the only manager that kept the system updated and trained new salespeople on how to use the program. Wright Dep., at 42; Bishop Dep., at 131-132.
Johnny Wright was Bishop's "right arm" for 25 years, and was the dealership's former general manager. He was the final decision-maker when Bishop was absent. Bishop Dep., at 14-15, 51.


training and customer satisfaction duties, and each of the sales managers took on larger sales responsibilities. Bishop Dep., at 100-101.

Clemmons testified he had the same qualifications and experience to do the job that Roden did, that he did "the same thing" as Hallmark, and that he could "probably" perform Wright's duties, but noted Wright was "unique. He's good." Clemmons Dep., at 106-107.

## Legal Standard

A moving party is entitled to summary judgment if there is no genuine issue of material fact, leaving final judgment to be decided as a matter of law. *See* FED. R. CIV. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1355-56 (1986). An issue is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. It is genuine if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The facts, and any reasonable inference therefrom, are to be viewed in the light most favorable to the non-moving party, with any doubt resolved in the nonmovant's favor. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158, 90 S.Ct. 1598, 1609 (1970). Once met by the moving party, however, the burden shifts to

the nonmovant to come forward with evidence to establish each element essential to that party's case sufficient to sustain a jury verdict.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

A party opposing a properly submitted motion for summary judgment may not rest upon mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial.  *Eberhardt v. Waters*, 901 F.2d 1578, 1580 (11th Cir. 1990).  In addition, the non-moving party's evidence on rebuttal must be significantly probative and not based on mere assertion or merely be colorable.  *See* FED. R. CIV. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S.Ct. 2505, 2511 (1986).  Speculation does not create a genuine issue of fact.  *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

## Analysis

The ADEA applies to any individual over forty years of age and makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's age." 29 U.S.C. § 623(a)(1)-(2).[9]  A plaintiff may prove his claim through circumstantial evidence[10] by invoking the three-step framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973).  *See Cofield v. Goldkist, Inc.*, 267 F.3d 1264, 1267 (11th Cir. 2001).

Under the *McDonnell Douglas* standard, if the plaintiff establishes a prima facie case, the employer must articulate a legitimate, non-discriminatory reason for the employment decision.  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S.

---

[9] The analysis for the AADEA is identical to that for the ADEA. *Robinson v. Alabama Central Credit Union*, 964 So. 2d 1225, 1228 (Ala. 2007) ("[T]he federal courts have applied to AADEA claims the same evidentiary framework applied to federal age-discrimination claims.  We agree that this framework . . . is the proper means by which to review an AADEA claim.").

[10] Although the plaintiff argues that the conversation regarding age that took place before the December 7, 2007, meeting constitutes direct evidence, this court disagrees. *See Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, (11th Cir. 1999) (employer's comment that he wanted "'aggressive, young men' like himself to be promoted" constitutes circumstantial evidence); *Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1499-1501 (11th Cir. 1991) (supervisor's comment that employee had "been around too long *and* [was] *too old* and [was] making too much money" constitutes circumstantial evidence).  Likewise, viewing the facts in the light most favorable to the plaintiff, the only evidence Clemmons believes supports his age discrimination claim is when he was asked his age during a "BS session" at work, during which other employees were talking about getting the CEO a birthday cake.  Such an inquiry does not constitute direct evidence of age discrimination. *See Van Vorhis v. Hillsborough County Bd. Of County Comm'rs*, 512 F.3d 1296, 1300 (11th Cir. 2008) ("[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, . . . constitute direct evidence of discrimination.") (citations omitted).

11

133, 142, 120 S.Ct. 2097 (2000).  The plaintiff then "has the opportunity to come forward with evidence . . . sufficient to permit a reasonable fact-finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," but instead were a pretext for discrimination.  *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)).

Until the Supreme Court's decision in *Gross v. FLB Financial Services, Inc.*, 129 S.Ct. 2343 (2009), courts had contemplated mixed-motive cases under the ADEA.  However, *Gross* clearly sets out that Congress's use of "because of" in the statutory language of 29 U.S.C. § 623 indicates that the ADEA prohibits discrimination when "age [is] the 'reason' that the employer decided to act." *Gross*, 129 S.Ct. at 2349 (citations omitted).  Accordingly, the Supreme Court held that a successful plaintiff in an ADEA case "must prove that age was the 'but-for' cause of the employer's adverse decision." *Id.* (citations omitted).  Thus, it is insufficient to show that age was simply a motivating factor in the employer's decision, and the burden of persuasion to show but-for causation rests with the plaintiff.  *Id.* at 2351.

1.  Prima Facie Case

Applying the facts of this case, it is clear to the court that Jim Bishop

Chevrolet's motion for summary judgment is due to be granted. When a position is eliminated in its entirety, a plaintiff proves his prima facie case of age discrimination by demonstrating:

> (1) that [he] was in a protected age group and was adversely affected by an employment decision, (2) that [he] was qualified for [his] current position or to assume another position at the time of discharge, and (3) evidence by which a fact finder could reasonably conclude that the employer intended to discriminate on the basis of age in reaching that decision.

*Smith v. J. Smith Lanier & Co.*, 352 F.3d 1342, 1344 (11th Cir. 2003). In this case, Clemmons is 65 years of age and Bishop admits that Clemmons had always been a good employee. Thus, the first two elements are met. However, looking at the facts in the light most favorable to the plaintiff, the plaintiff's belief that he was the victim of age-based discrimination is a conversation that took place two weeks before December 7, 2007. The plaintiff does not dispute[11] that the conversation was a "BS session" unrelated to work during which he and his two superiors were discussing a birthday cake some of the employees were getting for Bishop. The plaintiff admits that his superiors could have determined his age by looking at his personnel file, but insists his employer manifested discriminatory animus by asking his age several times during the "BS session" during which Bishop's

---

[11]The plaintiff repeatedly stated that he simply cannot remember the conversation. Clemmons Dep., at 62-63, 67-68.

birthday was being discussed. The surprise Bishop expressed upon hearing the plaintiff's age was explained in his undisputed testimony: "[Clemmons] don't look like he's 65. He gets around good." Thus, the court considers this very scant evidence of age-based discriminatory animus and will assume for purposes of the motion for summary judgment that the plaintiff has met his burden to prove a prima facie case.

2. Legitimate, Non-Discriminatory Reasons

Therefore, assuming *arguendo*, that plaintiff can establish a prima facie case, the defendant has presented ample evidence of legitimate and non-discriminatory reasons for removing the plaintiff from his management position. Jim Bishop Chevrolet has shown that the dealership was not operating at profit from 2005 through 2008; it implemented cost-containment measures as early as 2005 by changing its floor plan, allocating less money to advertising, and maintaining a general posture of frugality at the dealership; and finally by lowering its largest expense, personnel, by offering the plaintiff employment as a salesperson, thereby eliminating the expense of a manager's commission, which comes from gross profit. At this stage, the defendant need only produce evidence sufficient for the trier of fact to conclude that petitioner suffered an adverse employment action for a legitimate, non-discriminatory reason, *Reeves*, 530 U.S.

at 142, and the defendant has met this burden.

3.  Pretext

Thus, the plaintiff has the onerous task of showing that the defendant's proffered reason is pretext and that but-for the plaintiff's age, he would have retained his position as sales manager.  *See Gross*, 129 S.Ct. at 2350.  This the plaintiff simply cannot do.  The evening that the plaintiff was removed from his position as a sales manager, Bishop told him that it "was just economics," which is supported by testimony from Wright and the tax returns of the dealership for 2005, 2006, 2007, and 2008.  Even the plaintiff admitted that his diminished pay in 2007 was a result of the dealership closing fewer deals.  Admittedly, the plaintiff's only evidence that Bishop acted with age-based discriminatory animus is his testimony concerning the "BS session" during which Bishop's birthday cake and Clemmons' age were discussed.  Taking this evidence in the light most favorable to Clemmons, the plaintiff cannot prove as a matter of law that he would have retained his position as sales manager but for his age.[12]

---

[12]Plaintiff makes two additional arguments that are unavailing.  First, plaintiff critiques Bishop for not conducting a cost-saving analysis to determine if he could cut expenses elsewhere.  However, Bishop was the CEO of the dealership and had no legal duty to perform such an analysis.  "It is by now axiomatic that we cannot second-guess the business decisions of an employer."  *Rowell v. Bellsouth Corp.*, 433 F.3d 794, 798 (11th Cir. 2005) (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1092 (11th Cir. 2004)).

## Conclusion

Having considered the foregoing, and finding that plaintiff has failed to establish any genuine issue of material fact sufficient to allow this case to proceed to trial on his claims against defendant, and that defendant Jim Bishop Chevrolet is entitled to judgment as a matter of law, it is **ORDERED** that defendant's motion for summary judgment be **GRANTED**.  Plaintiff's claims shall be **DISMISSED WITH PREJUDICE** by separate order.

**DONE** and **ORDERED** this the 10th of May 2010.

*/s/ Inge Prytz Johnson*
INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE

---

Second, plaintiff argues that four younger managers were hired after Clemmons' refused to take the salesperson position, allegedly to replace Clemmons.  However, the undisputed evidence is that these changes took place after Bishop sold the dealership and accordingly cannot be used to prove that Bishop intended to replace Clemmons with younger employees.  Bishop Dep., at 61-62.